UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AMANDA JACKS and BARBARA THOMASON, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:24-CV-1925-B |
| MINEARC SYSTEMS AMERICA LLC, | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant MineArc Systems America LLC ("MineArc")'s Motion for Summary Judgment (Doc. 49). For the reasons explained below, the Court **GRANTS** MineArc's Motion for Summary Judgment.

## I.

## BACKGROUND

This is an employment discrimination case. MineArc is a manufacturing company that ships "hazardous and non-hazardous products around the world." Doc. 50, Mot. Summ. J. Br., 2. Plaintiff Barbara Thomason and Plaintiff Amanda Jacks were employees at MineArc. Thomason has Attention Hyper-Deficit Disorder (ADHD), anxiety, and depression. Doc. 55, Pls.' Resp. Br., 2. Jacks has Attention Deficit Disorder (ADD). *Id.* Both Thomason and Jacks take mental health medication. *Id.* Furthermore, both are openly gay women. *Id.* Below are the pertinent facts of their employment with MineArc, from hiring to departure.

A.    *Thomason and Jacks's Job Performance at MineArc*

In October 2021, MineArc hired Plaintiff Barbara Thomason to act as the company's logistics coordinator. Doc. 50, Mot. Summ. J. Br., 2. As logistics coordinator, Thomason reported to Robert Anderson, MineArc's service manager. *Id.* Anderson had worked with Thomason at a prior employer and was aware of her sexual orientation. *Id.*

Thomason's performance at work was middling at best. In 2022, Thomason received a 34.4 out of 50 on her year-end performance evaluation. *Id.* at 3. In 2023, Thomason had surgery and was out of work from early February to mid-March. *Id.* Upon her return, she was placed on probation "to better assess [her] overall ability to function as the Logistic . . . Coordinator. *Id.* Then, in May 2023, Thomason, without notice, failed to show up for work for 12 days. *Id.* at 3-4. She returned to work on May 29, 2023. *Id.* at 4. In July 2023, MineArc demoted Thomason to a shipping clerk position due to continued poor performance. *Id.* at 4. Ian Hunt became Thomason's new supervisor. *Id.* After Thomason received an overall score of 55% on her performance review, she was placed on a performance improvement plan starting January 1, 2024. *Id.*

On June 20, 2023, MineArc hired Jacks to take over the logistics coordinator role. *Id.* at 5. MineArc explained to Jacks that, after being hired, she would be expected to obtain Hazmat certifications for Ground, Air, and Ocean shipping. *See* Doc. 51, Ex. A-4, Jacks Dep., 39:24-40:3.

A few months into Jacks's tenure, she and Thomason came to both be supervised by Kyle Evans, MineArc's Operation Manager. Doc. 50, Mot. Summ. J. Br., 5.

At Jacks's end-of-year review, Evans and James Rau (MineArc's General Manager) gave Jacks an overall manager rating of 69.6 and told her to complete Hazmat training no later than March 3, 2024. *Id.* at 6. However, that date passed and Jacks did not complete her Hazmat training. *Id.*

Consequently, Jacks received a "Corrective Action Form." *Id.* The form provided Jacks with an extension to get her Hazmat certification and time during work to complete the training. *Id.* But Jacks refused to sign the corrective action form. *Id.* at 7.

B.      *The Stench Gas, Jacks's Termination, and Thomason's Departure*

In mid-to-late February, MineArc received a shipment of "stench gas" that Plaintiffs believed had a leak. *Id.* at 6. MineArc did not agree that the stench gas was leaking. *Id.* Nevertheless, on March 5, 2024, James Alvarez, MineArc's supply chain manager, requested anti-stench spray to neutralize the smell pursuant to Evans's instruction. Doc. 56, Ex. A-3, 21-22[1]. Plaintiffs opposed using the anti-stench spray because they believed it would only conceal the purported leak. *See* Doc. 55, Pls.' Resp. Br., 7. They believed that shipping the stench gas out, if it was leaking, would violate the law. *Id.*

MineArc's proverbial last straw with Jacks was an episode in which she failed to follow a direct instruction. On March 14, Evans asked Jacks to get three quotes for certain shipments (hereinafter the "Biora quotes"). Doc. 55, Pls.' Resp. Br., 7; *see* Doc. 51, Ex. D-8, 258. Jacks responded that she had already scheduled the shipment. Doc. 51, Ex. D-8, 258. But Jacks had not actually obtained the Biora quotes. Doc. 50, Mot. Summ. J. Br., 7.

That same day, Jacks was terminated at a meeting with Evans and Karla Munoz, the Human Resources/ Executive Assistant at MineArc. Doc. 56, Ex. B, Jacks Dep., 88:10-14. Evans told her in the meeting that she was being terminated for insubordination for not obtaining the Biora quotes. *Id.* at 88:16-22; *see* Doc. 56, Ex. A-6, Termination Recording 00:56-1:30. MineArc asserts the final termination decision was made by Rau. Doc. 50, Mot. Summ. J. Br., 7. He made the decision to

---

[1] MineArc raises various evidentiary objections to Plaintiffs' summary judgment response appendix. Doc. 59, Def.'s Reply, 1-8. To the extent the Court cites evidence to which Defendant objected, the Court overrules that objection.

terminate Jacks because of her "inability to complete Hazmat training, her refusal to sign [the corrective action form], and . . . refusal to listen to her supervisor's instruction." *Id.*; Doc. 51, Ex. B, Rau Decl. ¶ 17. Plaintiffs dispute Jacks was terminated because of her Hazmat training as she was terminated before the extended deadline to complete the training had passed. Doc. 55, Pls.' Resp. Br., 11. They also dispute that obtaining quotes for shipments was in Jacks's job description. *Id.* at 9.

After Jacks was terminated, Thomason stopped showing up to work. *Id.* at 11; Doc. 51, Ex. B, Rau Decl. ¶ 18. Thomason stated she stopped going to work due to bullying and fears of retaliation. Doc. 55, Pls.' Resp. Br., 11.

Then, on April 16, 2025, MineArc unexpectedly received Thomason's notice of application of unemployment benefits. Doc. 51, Ex. B, Rau Decl. ¶ 18. Given the circumstances, MineArc then opted to terminate Thomason's employment. *Id.*

C.      *Anderson and Evans's Discriminatory Conduct*

Thomason and Jacks assert they were subject to the following harassment from Anderson and Evans due to their disabilities: (1) Anderson mocked Thomason for taking or not taking her "crazy meds" "two to three times a month"; (2) Jacks heard Anderson make the "crazy meds" remark to Thomason; and (3) Evans allegedly told Jacks "yeah that ADD," after she had made a mistake in front of him. Doc. 55, Pls.' Resp. Br., 5-6; Doc. 56, Ex. C, Thomason Dep., 116:5.

Additionally, Thomason and Jacks assert they were subject to the following harassment from Anderson and Evans due to their gender/sexual orientation: (1) Anderson referred to the Plaintiffs as "girlfriends" even though the two women were not in a romantic relationship; (2) Anderson called Thomason a "boy" when she got a short haircut; (3) Evans told Jacks she "looks like a dude" when

she wore a hat; (4) Anderson told Plaintiffs "stop being so sensitive. Take a Midol and get over it";[2] (5) Anderson said "lesbians are always in a clique"; and (6) Thomason testified that Evans would tell her "I'll get with a man about it." *Id.* at 3-4, 14.

Jacks and Thomason timely sued MineArc after receiving their right-to-sue letters from the EEOC. They bring claims for (1) disability discrimination by hostile work environment under the Americans with Disabilities Act ("ADA") and Chapter 21 of the Texas Labor Code (the "TCHRA"); (2) sex/gender discrimination by hostile work environment under Title VII and the TCHRA; (3) disability discrimination in violation of the ADA and the TCHRA; and (4) wrongful discharge for refusing an unlawful order under the cause of action recognized in *Sabine Pilot Services, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).[3] Doc. 54, Pls.' Resp., 1-2.

## II.

### LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). On a motion for summary judgment, the burden is on the movant to prove that no genuine dispute exists as to a material fact. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine dispute exists for trial, courts must view all of the evidence in the light most favorable to the non-movant. *See Chaplin v.*

---

[2] Midol is an over-the-counter medication used to relieve menstrual symptoms.

[3] In their summary judgment response, Plaintiffs voluntarily withdrew their retaliation claims, as well as all claims arising under the Family Medical Leave Act. Doc. 54, Pls.' Resp., 1-2.

*NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002). When the nonmovant would bear the burden of proof on an issue at trial, the movant can secure summary judgment "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to material facts, . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' . . . or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (other citations omitted). A non-moving party with the burden of proof at trial must "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). In such cases, the non-moving party's proffered evidence "must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial." *Id.* (citations omitted). Finally, the evidence that any party proffers "must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citation omitted).

Federal Rule of Civil Procedure 56(d) permits a court to "defer" or "deny" the summary judgment motion if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." To successfully request deferred consideration under Rule 56(d), a party must "show (1) why [it] needs additional discovery and (2) how that discovery will create a genuine issue of material fact." *January v. City of Huntsville*, 74 F.4th

646, 651 (5th Cir. 2023) (citation omitted). "It's not enough to simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Id.* (internal quotations and citation omitted). "Instead, [the party] 'must set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.'" *Id.* (citing *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)). "In other words, if a party 'fails to explain what discovery it had, why it was inadequate and what it expected to learn from further discovery' and instead offers only 'vague assertions of the need for additional discovery,' it will not be entitled to a continuance." *Bryant v. Bank of Am. N.A.*, No. 3:15-CV-3818-B, 2016 WL 8715621, at *2 (N.D. Tex. June 3, 2016) (Boyle, J.) (quoting *Bauer v. Albemarle Corp.*, 169 F.3d 962, 968 (5th Cir. 1999)) (brackets omitted).

### III.

### ANALYSIS

First, the Court addresses Plaintiffs' request to deny MineArc's summary judgment motion pursuant to Rule 56(d). Second, the Court discusses MineArc's summary judgment motion on Plaintiffs' hostile work environment claims. Third, the Court evaluates MineArc's summary judgment motion on Plaintiffs' disability discrimination claims. Fourth, the Court examines MineArc's summary judgment motion on Plaintiffs' wrongful termination claims under *Sabine Pilot*.

A.    *Rule 56(d) Motion*

In Plaintiffs' summary judgment response, they request that the Court deny MineArc's motion for summary judgment because discovery was still outstanding at the time Plaintiffs' response was due. Doc. 55, Pls.' Resp. Br., 13. Specifically, Plaintiffs assert they had not yet taken the

deposition of Anderson, whose testimony is "critical and necessary." *Id.* In opposition, MineArc argues that Plaintiffs have not been diligent in pursuing discovery and that the Court should not defer or deny the summary judgment motion to obtain additional discovery. Doc. 59, Def.'s Reply Br., 9-10.

The Court denies Plaintiffs' request for relief under Rule 56(d) because, even if Anderson would testify that he said the statements Plaintiffs attribute to him, it would not raise a genuine dispute as to a material fact sufficient to survive summary judgment. In its analysis on the claims below, the Court considers the statements as to which genuine disputes remain. Even if Plaintiffs could show that Anderson made those statements, MineArc would be entitled to summary judgment. Insofar as Anderson's deposition might reveal any statements beyond what Plaintiffs attribute to him, their request is too vague to show that discovery is needed "for specified reasons." *See* FED. R. CIV. P. 56(d). Accordingly, the Court denies Plaintiffs' Rule 56(d) request.

B.      *Hostile Work Environment Claims*

Plaintiffs assert they were subject to unwelcome harassment at MineArc due to their disabilities and gender/sexual orientation. Doc. 55, Pls.' Resp. Br., 16-17. The Court first outlines the relevant legal principles for hostile work environment claims, then evaluates the claims based on disability, and finally evaluates the claims based on sex or gender.

1.      <u>Legal Standard for a Hostile Work Environment Claim</u>

"The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *EEOC v. LHC Grp.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). Title VII prohibits employers from discriminating based on someone's sex, sexual orientation, or gender identity. *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595,

598 (5th Cir. 2021) (citing 42 U.S.C. § 2000e-2(a)(1)). Hostile work environments can form the basis of a claim under either statute. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001); *Maranto v. Tri-Par. Contractors, Inc.*, No. 3:17-CV-01120-BAJ-EWD, 2018 WL 1003750, at *2 (M.D. La. Feb. 21, 2018) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986)).

To support a claim for discrimination by hostile work environment, Plaintiffs must show that they (1) belonged "to a protected group"; (2) were "subjected to unwelcome harassment"; (3) "that the harassment complained of was based on" their protected characteristic; (4) "that the harassment complained of affected a term, condition, or privilege of employment"; and (5) "that the employer knew or should have known of the harassment and failed to take prompt, remedial action." *Flowers*, 247 F.3d at 235-36 (citations omitted). The elements of a hostile work environment claim are the same under Title VII, the ADA, and the TCHRA. *See id.* ("A cause of action for disability-based harassment is modeled after the similar claim under Title VII." (quotation marks and citation omitted)); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010) (applying Title VII precedent to a TCHRA hostile work environment claim).

Here, MineArc argues Plaintiffs cannot raise a genuine dispute of material fact on the fourth element of their hostile work environment claims. Doc. 50, Mot. Summ. J. Br., 38-42.[4]

The fourth element requires the harassment to "be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Wantou v. Wal-Mart Stores Tex., LLC*, 23 F.4th 422, 433 (5th Cir. 2022) (internal quotation marks and citation omitted). "The environment must be 'both objectively and subjectively offensive, one that a

---

[4] MineArc also asserts Plaintiffs cannot raise a fact issue on the fifth element of their hostile work environment claims. *Id.* at 43. As Plaintiffs failed to raise a fact issue on the fourth element, the Court need not address the fifth element.

reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). "The totality of the employment circumstances determines whether an environment is objectively hostile." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Although no single factor is determinative, pertinent considerations are: (1) 'the frequency of the discriminatory conduct'; (2) 'its severity'; (3) 'whether it is physically threatening or humiliating, or a mere offensive utterance'; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 21).

The fourth element's "test—whether the harassment is severe or pervasive—is stated in the disjunctive." *Id.* (citing *Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 163 (5th Cir. 2007)). "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Id.* (citation omitted). "The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Id.* (citation omitted). Therefore, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Id.* (citation omitted).

Within the fourth element, when conducting a holistic evaluation of the objective offensiveness of a work environment, courts keep in mind that "[t]he legal standard for workplace harassment is 'high.'" *Zuniga v. City of Dallas*, No. 3:23-CV-2308-D, 2024 WL 2734956, at *3 (N.D. Tex. May 28, 2024) (Fitzwater, S.J.) (quoting *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003)). "'[M]erely offensive' conduct is not actionable." *Id.* (quoting *Harris*, 510 U.S. at 21).

"[T]he Supreme Court has warned that these high standards are intentionally demanding 'to ensure that Title VII does not become a general civility code,' . . . and when properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language.'" *Howard v. United Parcel Serv., Inc.*, 447 F. App'x 626, 632 (5th Cir. 2011) (per curiam) (quoting *Faragher*, 524 U.S. at 788).

2.   <u>The Court grants summary judgment to MineArc on Plaintiffs' disability discrimination by hostile work environment claims as both Plaintiffs fail to raise a fact issue on the fourth element</u>

Plaintiffs fail to raise a fact issue on whether the asserted disability-based harassment affected a term, condition, or privilege of their respective employment.

Starting with Thomason's claim, she raises insufficient evidence to permit a reasonable fact finder to infer Anderson's comments, that Thomason had or had not taken her "crazy meds," created a hostile work environment. In making this determination, the Court walks through the four factors set out in *Harris*, 510 U.S. at 21. While there is sufficient evidence indicating Anderson made the "crazy meds" comments with some frequency (two to three times a month) the comments are best characterized as "mere offensive utterance[s]." *See Wantou, LLC*, 23 F.4th at 433. Thomason presents no evidence indicating the comments were severe. They did not dehumanize or debauch Thomason. Nor were the comments physically threatening. Likewise, although Thomason testified her co-workers laughed when Anderson made the comment in front of them, she was able to "roll[ ] with it"—suggesting she did not find the comment particularly humiliating. Doc. 56, Ex. C, Thomason Dep., 114:24-25. Lastly, Thomason's conclusory statement that she stopped showing up to work because she was "bullied" and "fear[ed] retaliation," *id.* at 91:6-7, does not show *how* Anderson's "crazy meds" comments altered the conditions of her employment. Resultingly, as

Thomason does not raise a fact issue on the fourth element of her hostile work environment claim for disability discrimination, summary judgment on the claim is appropriate.

Jacks's evidence for disability harassment also does not raise a genuine dispute on the fourth element. Jacks relies upon a direct comment made by Evans and overhearing Anderson's "crazy meds" comment directed at Thomason. Namely, after she made a mistake in front of Evans, he said to her "yeah that ADD." Doc. 56, Ex. B, Jacks Dep., 113:17-19. Jacks also testified she heard Anderson ask Thomason if she did or did not take her "crazy meds" and that hearing the comment made her feel "frustrat[ed]." *Id.* at 110:13-24.

Jacks fails to raise a fact issue on the fourth element of her hostile work environment claim as no reasonable juror could find the conduct that aggrieves her was sufficiently severe or pervasive to alter her employment. Jacks offers no evidence indicating the comments were frequent, physically threatening, or humiliating rather than a "mere offensive utterance." *See Wantou*, 23 F.4th at 433. Moreover, she fails to show how the complained-of conduct "unreasonably interfere[d] with" her performance at work. *See id.* Accordingly, Jacks has not raised a genuine dispute of material fact on the fourth element of her hostile work environment claim. Summary judgment on Jacks's disability discrimination by hostile work environment claim is therefore appropriate.

As Plaintiffs have failed to show that they can provide facts to raise a genuine dispute on all elements of their disability based hostile work environment claims, the Court grants summary judgment to MineArc.

3.    The Court grants summary judgment on Plaintiffs' sex/gender discrimination by hostile work environment claims as both Plaintiffs fail to raise a fact issue on the fourth element

Because Plaintiffs failed to raise a fact issue on the fourth element—that the alleged sex-based harassment affected a term, condition, or privilege of employment—the Court grants summary judgment for MineArc.

In support of their claims, Plaintiffs cite to the following evidence of sex harassment: (1) Anderson told Plaintiffs to "[s]top being so sensitive . . . [t]ake a Midol and get over it"; (2) Anderson would ask Plaintiffs "where's your girlfriend" in reference to either Plaintiff; (3) Evans once told Jacks that she looked "like a dude" when she wore a hat; (4) Anderson called Thomason a boy when she got short haircuts; (5) Anderson said "lesbians are always in a clique"; and (6) Evans told Thomason "I'll get with a man about it."[5] Doc. 55, Pls.' Resp. Br., 3-4, 14.

Examining the totality of the circumstances and viewing the evidence in the light most favorable to the Plaintiffs, they have not shown that the comments made by Anderson or Evans were sufficiently severe or pervasive to alter the conditions of their employment. First, Plaintiffs have shown that some of the gender/sex harassment was frequent. Plaintiffs' testimony shows Anderson made the "girlfriends" comment on multiple occasions. Moreover, they generally suggest the comments that "lesbians are always in a clique" and that Thomason looked like a boy were made more than once. On the other hand, Plaintiffs do not bring forth evidence to suggest Anderson's

_____

[5] While Plaintiffs purport to rely upon this statement by Evans as evidence of gender/sex harassment, the Court notes that Thomason's deposition testimony in context would preclude a reasonable fact-finder from inferring Evans's "I'll get with a man about it" comment discriminated based on Thomason's sexual orientation/gender. The deposition testimony states: "[Evans] almost avoided me like a plague. I mean, he went to Amanda. When I would try to confront him, he would just say, 'I'll get with a man about it. I'll get with a man about it.' So as far as that communication, . . . that's going to be with Kyle, is going to be with Amanda. She reported to him, not me." Doc. 56, Ex. C, Thomason Dep., 133:6-12. As Jacks (the "Amanda" referenced) and Thomason are both openly gay women, Evans's avoidance of Thomason to go instead talk to Jacks indicates he avoided Thomason for some other reason not based on her sexual orientation or gender.

"Midol" comment or Evans's "looks like a dude" comment were more than one-time occurrences. Indeed, Jacks testifies that after she confronted Evans about the "dude" comment, he did not make it again. Doc. 56, Ex. B, Jacks Dep., 118:3-5.

Second, Plaintiffs do not offer evidence showing the comments were severe or "physically threatening or humiliating" rather than "merely an offense utterance." *See Wantou*, 23 F.4th at 433. In fact, Thomason testifies that she also called Jacks a dude over text. Doc. 56, Ex. C, Thomason Dep. 130:7-12. Besides generally asserting the other comments were made, the Plaintiffs provide very little to no details on the context or nature of the comments.

Most importantly, Plaintiffs do not bring forth evidence showing the comments interfered with their ability to perform their work. *See Wantou*, 23 F.4th at 433. In contrast to plaintiffs that succeed on hostile work environment claims, the Plaintiffs here have not brought forth evidence that the complained-of comments affected them, beyond hurting their feelings. They do not show the comments were so humiliating that they could not properly interface with others at work. Nor do they show the comments were so incessant that they prohibited them from completing their work. Lastly, they do show the comments demeaned them to the point that it was impossible to succeed in the workplace. Title VII is not "a general civility code." *See Faragher*, 524 U.S. at 788.

Without more, a reasonable fact finder could not find the sex/gender harassment was severe or pervasive enough to alter the conditions of Plaintiffs' workplace. Accordingly, summary judgment on the sex/gender discrimination by hostile work environment claims is proper.

C.      *Disability Discrimination Discharge Claims*

"TCHRA disability discrimination claims are analyzed under the same standard as ADA discrimination claims." *Drerup v. Consol. Nuclear Sec., LLC*, No. 2:19-CV-106-BR, 2021 WL 2425257, at *9 n.4 (N.D. Tex. May 14, 2021) (Reno, Mag. J.), *aff'd*, No. 21-10600, 2022 WL 3335780 (5th Cir. Aug. 12, 2022) (citation omitted). "In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792 (1973)]." *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016). The *McDonnell Douglas* framework has three steps. First, the plaintiff-employee must set forth evidence to support each element of his prima facie case of discrimination. *See id.* at 765. For disability discrimination, a plaintiff-employee must prove (1) he was disabled; (2) he was qualified for the job, and (3) there was a causal connection between the alleged adverse employment action and his disabilities. *Id.*

If the plaintiff is successful at step one, the defendant-employer faces the burden at step two to respond with a legitimate, nondiscriminatory reason for terminating the plaintiff. *See id.* (citation omitted). The defendant's burden "is one of production, not persuasion, and it involves no credibility assessment." *Royall v. Enter. Prods. Co.*, No. 21-40119, 2022 WL 263404, at *2 (5th Cir. Jan. 26, 2022) (internal quotation marks and citation omitted). If the defendant can furnish such a reason, step three shifts the burden back to the plaintiff to counter with "substantial evidence" that the given reason is pretextual. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022) (citing *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021) (noting that once the defendant produces

a legitimate, nondiscriminatory basis for termination, a plaintiff's "presumption of discrimination disappears," even when the plaintiff is the nonmoving party opposing summary judgment)).

Here, Plaintiffs appear to apply the *McDonnell Douglas* framework in their summary judgment response. *See* Doc. 55, Pls.' Resp. Br., 24-28. Plaintiffs also request that the Court apply a mixed-motive analysis—a standard that is sometimes applied at step three in Title VII cases. *See id.* at 24. Because the Court does not reach step three of the analysis on either Plaintiff's discrimination claim, the Court need not determine whether a mixed-motive approach should be applied.

MineArc argues that summary judgment is appropriate on the disability discrimination claims because neither Plaintiff can set forth evidence to support the third element of their prima facie case—that there was a causal connection between the alleged adverse employment action and their disabilities. Doc. 50, Mot. Summ. J. Br., 22-23. Plaintiffs therefore must carry their burden to set forth evidence that there was a causal connection between the adverse employment actions and their disabilities. *Rodriguez*, 820 F.3d at 765. The Court will evaluate each Plaintiff's prima facie case for disability discrimination below.

1.    Thomason cannot support a prima facie case for disability discrimination

The alleged adverse employment action in Thomason's claim is that she was constructively discharged when she stopped coming to work after Jacks was terminated. Thomason's claim fails because she was not constructively discharged.

In their summary judgment response, Plaintiffs contend that when Thomason—a gay woman with disabilities—stated she would not be returning to work, she was constructively discharged. Doc. 55, Pls.' Resp. Br., 28-29. An employer's actions can constructively discharge an employee when the "working conditions [become] so intolerable that a reasonable person in the employee's position

would have felt compelled to resign." *Aryain, v. Wal-Mart Stores, Tex., LP*, 534 F.3d 473, 481 (5th Cir. 2008) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Constructive discharge can constitute an adverse action. *Thomas v. Atmos Energy Corp.*, 223 F. App'x 369, 378 (5th Cir. 2007). "Constructive discharge occurs when an employee has quit her job under circumstances that are treated as an involuntary termination of employment." *Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004) (citing *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). Evidence of "[c]onstructive discharge requires a greater degree of harassment than required by a hostile environment claim." *Lauderdale*, 512 F.3d at 167 (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)).

Thomason cannot support a prima facie case for disability discrimination premised on constructive discharge because she has not shown a "greater severity of pervasiveness or harassment than the minimum required to prove a hostile work environment claim." *Woods v. Delta Beverage Grp.*, 274 F.3d 295, 301 (5th Cir. 2001) (citation omitted). As explained above, Thomason has not provided enough facts to support a hostile work environment claim based on disability discrimination, so she cannot support a constructive discharge claim premised on the same conduct.

Moreover, the Fifth Circuit has stated that "[i]n the constructive discharge context, . . . 'part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.'" *Aryain*, 534 F.3d at 481-82 (quoting *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir. 1987)). "An employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged." *Williams v. Barnhill's Buffet Inc.*, 290 F. App'x 759, 762 (5th Cir. 2008) (unpublished) (citing *Woods*, 274 F.3d at 301). Moreover, "[w]hen possible, a reasonable employee would and should attack unlawful

-17-

discrimination within the context of existing employment relationships, such as pursuing an internal grievance process or filing an EEOC complaint, instead of immediately resigning." *Garvin v. Sw. Corr., LLC*, 391 F. Supp. 3d 640, 654 (N.D. Tex. 2019) (Boyle, J.) (citing *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990)).

According to Plaintiffs, Thomason stopped appearing at work after Jacks's termination, where she "witnessed her colleague in the same protected classes as her be terminated for what she perceived to be an illegal reason." Doc. 55, Pls.' Resp. Br., 28. However, Thomason states in her deposition that she did not know what was going on when Jacks was terminated as she was not in the room. Doc. 56, Ex. C, Thomason Dep., 105:8-12. She therefore "jump[ed] to conclusions" when she determined Jacks was terminated for an illegal reason without bringing the issue up with anyone at MineArc. *See Aryain*, 534 F.3d at 481. A reasonable employee in Thomason's position would have at least inquired what MineArc's stated reason for terminating Jacks was before refusing to show up for work. *See Haley*, 391 F.3d at 652 (commenting that a reasonable employee should try a less extreme option prior to walking off her job).

Furthermore, it is undisputed that Plaintiffs did not report Anderson or Evans's comments regarding their protected characteristics to Human Resources or Rau.[6] *See Aryain*, 534 F.3d at 842 (noting employee did not act "reasonable" when she did not complain as she "assumed the worst" and consequently did not give employer an opportunity to "remedy" the basis for her complaints). Plaintiffs also do not show Thomason pursued an internal grievance process or filed an EEOC complaint before deciding Jacks's termination day would be her last day as well. *See Garvin*, 391 F.

---

[6] Although the Plaintiffs claim they reported Anderson's comments regarding their protected characteristics to Ian Hunt, a MineArc Supervisor, *see* Doc. 55, Pls.' Resp. Br., 15, the evidence they identify does not support that contention. *See* Doc. 56, Ex. A-11, 49-50; *Id.*, Ex. C, Thomason Dep., 122:13-14.

Supp. 3d at 654. Accordingly, as Thomason did not act reasonably, she cannot show that she was constructively discharged. *See Williams*, 290 F. App'x at 762.

Thomason has failed to offer evidence that she was constructively discharged and therefore cannot support a prima facie case of disability discrimination.

### 2.    Jacks cannot support a prima facie case for disability discrimination

Plaintiffs do not identify sufficient evidence of discriminatory animus to support a prima facie case and overcome summary judgment for Jacks's disability discrimination claim.

MineArc argues Plaintiffs have no evidence of a causal connection between Jacks's disability and her termination. Doc. 50, Mot. Summ. J. Br., 22. In response, Plaintiffs do not directly address the causal connection element and instead argue Jacks's termination was pretextual and "manufactured" to terminate her based on her disability. Doc. 55, Pls.' Resp. Br., 26. But showing pretext is the third step of *McDonell Douglas*; to get there, Plaintiffs must first carry their initial burden at step one and bring forth evidence that could show Jacks was terminated because of her disability. *See Rodriguez*, 820 F.3d at 765

As evidence of disability discrimination, Jacks testified that Evans said "yeah that ADD" to her after she made a mistake in front of him.[7] The parties do not dispute that Evans played a role in the decision to terminate Jacks.

The Fifth Circuit has explained that "comments are evidence of discrimination only if they are 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority

---

[7] Plaintiffs also assert Jacks was replaced by a man without disabilities. Doc. 55, Pls.' Resp. Br., 28. But the evidence to which they cite does not support that the man in question lacked disabilities. *See* Doc. 56, Ex. D, Rau Dep., 118-121.

over the employment decision at issue; and 4) related to the employment decision at issue." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (citation omitted). "Comments that do not meet these criteria are considered 'stray remarks,' and standing alone, are insufficient to defeat summary judgment." *Id.* (citation omitted).

While Evans's comment to Jacks meets the first and third criteria, Plaintiffs do not provide any evidence to show that Evans said the comment close in time to Jacks's termination or that it was in any way related to her termination. One stray comment, without any logical or temporal connection to Jacks's termination, does not satisfy Jacks's burden to provide evidence of a causal connection between her disability and termination. Accordingly, Jacks does not make out a prima facie claim of disability discrimination.

The Court grants summary judgment on Plaintiffs' disability discrimination discharge claims.

D.     *Sabine Pilot Claims*

Lastly, the Court grants summary judgment on Plaintiffs' claims of wrongful termination for refusing to follow an illegal order because Plaintiffs have not shown refusing to ship the stench gas was the *sole* reason for their termination.

"Texas is an at-will employment state, meaning an employee can be fired at any time without cause." *Karna v. BP Corp. N. Am.*, 609 F. App'x 814, 817 (5th Cir. 2015) (citing *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993)). "There is a narrow exception, however, when an employer discharges an employee solely because that employee refused to perform an illegal act." *Id.* (citing *Sabine Pilot*, 687 S.W.2d at 735). To succeed on a *Sabine Pilot* wrongful discharge claim, an employee must show that "(1) she was required to commit an illegal act which carries criminal

penalties; (2) she refused to engage in the illegality; (3) she was discharged; [and] (4) the sole reason for her discharge was her refusal to commit an unlawful act." *Id.* (quoting *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003)). "A plaintiff can also prove a *Sabine Pilot* claim by showing that she was constructively discharged." *Id.* (citing *Nguyen v. Tech. & Sci. Applic'n, Inc.*, 981 S.W.2d 900, 902 (Tex. App.–Houston [1st Dist.] 1998, no pet.)). But "[a]n employer who discharges an employee both for refusing to perform an illegal act and for a legitimate reason or reasons cannot be liable for wrongful discharge." *Fitch v. Reliant Pharms., LLC*, 192 F. App'x 302, 303 (5th Cir. 2006) (quoting *Tex. Dep't of Hum. Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995)).

Both Plaintiffs assert they were wrongfully discharged because they refused to ship leaking stench gas, which would violate 49 C.F.R. § 173. *See* Doc. 55, Pls.' Resp. Br., 7, 30. MineArc argues that summary judgment should be granted on the *Sabine Pilot* claim because Thomason and Jacks were not terminated due to their refusal to ship the stench gas. Doc. 50, Mot. Summ. J. Br., 16-18.

MineArc asserts Jacks was terminated for refusing to follow orders on multiple occasions. Specifically, Jacks (1) failed to sign her corrective action form, (2) delayed in obtaining her hazmat training; and (3) did not obtain the Biora quotes.

Plaintiffs dispute that Jacks was delayed in obtaining her hazmat training, whether obtaining quotes was a job requirement, and whether failing to do so was a fair or legitimate reason for termination. Notably, Plaintiffs do not address Jacks's failure to sign the corrective action form. Fair or unfair, if another reason for termination exists, it forecloses the possibility that failure to follow an illegal command was the sole reason. There is at least one undisputed, legitimate, reason for Jacks's termination: failing to sign her corrective action form. There are also multiple instances of Jacks not following MineArc's lawful orders. Jacks's *Sabine Pilot* claim therefore fails.

For Thomason, because the Court determined above that her departure was not the result of a constructive discharge, there is no dispute that MineArc terminated her after she stopped showing up for work without explanation and MineArc received her notice of unemployment benefits. Doc. 51, Ex. B, Rau Decl. ¶ 18. That supplies an alternate reason for the termination and forecloses Thomason's *Sabine Pilot* claim.

Because Plaintiffs cannot point to evidence demonstrating that their refusal to ship the stench gas was the "sole" reason for their termination, summary judgment on their *Sabine Pilot* claims is proper.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** MineArc's Motion for Summary Judgment (Doc. 49). A final judgment will follow. As no claims remain, the pretrial conference and trial date are hereby **VACATED**.

**SO ORDERED.**

**SIGNED: March 19, 2026.**

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE